UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X

STEPHEN A. AGAPITO,                    :

                    Plaintiff,         :

    -against-                          :        12 Civ. 2108 (PAC)(HBP)

CAROLYN W. COLVIN, Commissioner of :            REPORT AND
Social Security,                                RECOMMENDATION
                                       :

                    Defendant.[1]
                                       :
-----------------------------------X


        PITMAN, United States Magistrate Judge:


        TO THE HONORABLE PAUL A. CROTTY, United States

District Judge,


I.   Introduction


        Plaintiff, Stephen Agapito, brings this action pursuant

to section 205(g) of the Social Security Act ("Act"), 42 U.S.C.

§ 405(g), seeking judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying his

application for disability insurance benefits ("DIB").

_____

        [1] Carolyn W. Colvin has replaced Michael J. Astrue as the
Commissioner of Social Security.  She is, therefore,
automatically substituted as the defendant in this action
pursuant to Fed.R.Civ.P. 25(d)(1).

Both Agapito and the Commissioner have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Docket Items 11 and 17).  For the reasons set forth below, I respectfully recommend that defendant's motion for judgment on the pleadings be denied, that plaintiff's motion for judgment on the pleadings be granted and that the case be remanded for further proceedings consistent with this report and recommendation.

II.  Background

    A.  Procedural Background

Plaintiff filed an application for DIB on March 23, 2010, alleging he had been disabled since May 1, 2008 (Tr.[2] 115-18).  The Social Security Administration denied plaintiff's application for benefits on June 1, 2010 (Tr. 60-63), and plaintiff timely requested and was granted a hearing before an Administrative Law Judge ("ALJ") (Tr. 66-67).  Plaintiff appeared with an attorney before ALJ Robert Gonzalez on July 21, 2011, and ALJ Gonzalez conducted a hearing at which plaintiff testified (Tr. 32-58).  On August 4, 2011, ALJ Gonzales issued a decision

---

[2] "Tr." refers to the administrative record that the Commissioner filed as part of its answer (see Docket Item 8), as required by 42 U.S.C. § 405(g).

2

finding that plaintiff was not disabled and was not, therefore, entitled to DIB (Tr. 17-30).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on January 25, 2012 (Tr. 1-6).

Plaintiff commenced this action challenging the Commissioner's decision on March 22, 2012 (Docket Item 2), and moved for judgment on the pleadings on October 28, 2012 (Docket Items 11-12).  Plaintiff asserts that ALJ Gonzalez made numerous legal errors in reaching his conclusion that he was not disabled and that his decision was not supported by substantial evidence (Plaintiff's Memorandum in Support Motion for Judgment on the Pleadings Under Rule [12(c)] Fed. R. Civ. P., dated Oct. 28, 2012 (Docket Item 12)("Pl. Mem.")).  Defendant argues that the Commissioner's determination was legally sound and supported by substantial evidence (Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings, dated Mar. 14, 2013 (Docket Item 18)("Def. Mem.")).

    B.   Plaintiff's
       <u>Social Background</u>

Plaintiff was born on June 12, 1966, and was 43 years old at the time he applied for DIB on March 23, 2010 (Tr. 115-

3

18).  He had a high school education and briefly attended college
(Tr. 35-36).  He lived alone and had no children (Tr. 41).  In
his application, he alleged that he had been unable to work since
May 1, 2008 due to (1) a back injury, (2) depression and (3)
spinal stenosis,[3] spinal arthrosis[4] and disc degeneration (Tr.
135).

> C.   Plaintiff's
>      Work History

A "Work History Report" filled out by plaintiff in
connection with his application for DIB indicates that plaintiff
intermittently held a variety of physically demanding jobs in the
fifteen-year period prior to his alleged period of disability
(Tr. 154-63):

- From October 1991 through February 1992, plaintiff
  worked full time as a machine operator in a
  manufacturing plant (Tr. 154).

---

[3] "Spinal stenosis is narrowing of the spinal column that
causes pressure on the spinal cord, or narrowing of the openings
(called neural foramina) where spinal nerves leave the spinal
column."  Spinal Stenosis - PubMed Health, http://www.ncbi.nlm.
nih.gov/pubmedhealth/PMH0001477/ (last visited Aug. 12, 2013).

[4] Arthrosis, or osteoarthritis, is "[a]rthritis
characterized by erosion of articular cartilage, either primary
or secondary to trauma or other conditions, which becomes soft,
frayed, and thinned with eburnation of subchondral bone and
outgrowths of marginal osteophytes."  Stedman's Medical
Dictionary at 1282 (27th ed. 2000).

- From March 1993 through March 1994, plaintiff worked full time as a machine operator in a warehouse (Tr. 154).

- In April 1994 through November 1995, plaintiff worked as a "picker/selector" in a medical warehouse (Tr. 154).

- In February 1996 through December 1997, plaintiff worked in shipping, receiving and floor sales at a retail warehouse (Tr. 154).

- From August 1998 through February 1999, plaintiff worked as a "picker/selector" in a retail warehouse (Tr. 154).

- From March through July 1999, plaintiff worked full time as a machine operator in a "warehouse/plant" (Tr. 154).

- From September 1999 through July 2000, plaintiff worked full time as a "picker/selector" in a warehouse (Tr. 154). This job involved frequent lifting of 50 pounds or more (Tr. 159).

- From April through July 2001, plaintiff worked part time in receiving and floor sales at a thrift store (Tr. 154). This job involved the unloading of one to two trucks each day, and required plaintiff to frequently lift furniture and beds weighing over 200 pounds (Tr. 159).

- From October 2001 through March 2002, plaintiff worked full time as a machine operator in an aluminum plant (Tr. 154). According to plaintiff, this job involved "not much lifting," but constant "half bend crouches" (Tr. 158).

- From September 2004 through May 2005, plaintiff worked full time as a "picker/selector" in a warehouse (Tr. 154). This job involved the frequent lifting of boxes containing auto parts, weighing up to 120 pounds (Tr. 157).

- From April through August 2007, plaintiff worked full time as a machine operator in a chemical plant (Tr. 154). This job involved the frequent lifting, dragging and rolling of barrels of wax that weighed 470 to 520 pounds (Tr. 156).

- From September 2007 through May 2008, plaintiff worked part time as a janitor in a restaurant (Tr. 154). This job required extensive walking, standing and kneeling, and also required plaintiff to frequently lift weights of 50 pounds (Tr. 155).

D.   Plaintiff's
     Medical Background

     1.   Evidence Prior to
          Alleged Onset Date

On May 24, 2007, plaintiff visited Middletown Community Health Center ("MCHC") complaining of a cough and shortness of breath (Tr. 369). Nurse Practitioner V. Figueroa diagnosed plaintiff with an upper respiratory infection and seasonal allergies (Tr. 370). Plaintiff's blood was also drawn and sent to a laboratory (Tr. 370). The laboratory testing did not reveal any abnormalities (Tr. 255).

On July 25, 2007, plaintiff visited MCHC complaining of skin irritation on his lower back, the result of coming into contact with "a few drops" of a "corrosive liquid" at his workplace (Tr. 333). Nurse Practitioner Linda A. Larocco

diagnosed plaintiff with a chemical burn and prescribed an
ointment for him (Tr. 334).

On January 9, 2008, plaintiff visited MCHC complaining
of congestion, sinus pain and a cough (Tr. 329).  Dr. Anees Ahmad
diagnosed plaintiff with an upper respiratory infection and
prescribed amoxicillin (Tr. 330).

    2.    Evidence During Alleged
          Period of Disability

On May 1, 2009, plaintiff was taken by ambulance to the
emergency room of Orange Regional Medical Center ("ORMC"),
complaining of lower back pain (Tr. 188-219).  Under the
subheading "History of Present Illness," Physician Assistant
Michelle Wilson noted the following:

> The patient is a 42 year[] old Male who presents
> with back pain.  The onset was gradual.  Duration
> lasting.  Location of pain:  Lumbar sacral.  Character
> of pain:  achy and throbbing.  The function limitation
> is minimal.  The mitigating factor is rest.  Prior
> episodes:  negative.

(Tr. 198).  PA Wilson also noted "lumbar paravertebral[5] muscular
tenderness" and that plaintiff was "[u]nable to walk" (Tr. 199).

While at ORMC, an x-ray of plaintiff's lumbosacral
spine showed "Normal alignment, Normal disc spaces, [and] No

---

    [5] Paravertebral means "[a]longside a vertebra or the
vertebral column." Stedman's at 1315.

fractures" (Tr. 199).  A computed tomography ("CT") scan of

plaintiff's lumbar spine was also conducted, and was summarized

by Dr. Joseph Racenelli as follows:

> There are degenerative changes at L4-5 and L5-S1
> with extensive osteophytosis[6] present as well as disc
> bulging.  There is an element of spinal stenosis at
> L4-5.  There is foraminal[7] stenosis on the right at
> L5-S1.  There is no evidence for fracture or metastatic
> disease.  The paraspinal soft tissues are normal.
> There is facet arthrosis at all levels.

(Tr. 210).  Plaintiff was discharged from ORMC on May 2, 2009,

prescribed Dilaudid[8] and Flexeril,[9] and told to follow up with

MCHC in one to two days (Tr. 200).

On August 12, 2009, plaintiff visited MCHC and met with

Dr. Mary Dore (Tr. 323-24).  Dr. Dore noted that plaintiff had

"hurt his back several months ago," and that his pain was "better

with [non-steroidal anti-inflammatory drugs] and muscle

_____

[6] An osteophyte is "[a] bony outgrowth or protuberance."
Stedman's at 1285.

[7] A foramen is "[a]n aperture or perforation through a bone
or a membranous structure."  Stedman's at 698.

[8] Dilaudid, a brand name of hydromorphone, "is used to
relieve moderate to severe pain."  MedlinePlus - Hydromorphone
Oral and Rectal, http://www.nlm.nih.gov/medlineplus/
druginfo/meds/a682013.html(last visited Aug. 12, 2013).

[9] Flexeril, a brand name of cyclobenzaprine, is "a muscle
relaxant, [and] is used with rest, physical therapy, and other
measures to relax muscles and relieve pain and discomfort caused
by strains, sprains, and other muscle injuries."  MedlinePlus -
Cyclobenzaprine, http://www.nlm.nih.gov/medlineplus
/druginfo/meds/a682514.html (last visited Aug. 12, 2013).

relaxants" (Tr. 323).  She noted that plaintiff "ha[d]
environmental allergies and mild asthma when he has bronchitis"
(Tr. 323).  She further noted that the May 2009 CT scan showed a
"diffuse degenerative disease" in the area of plaintiff's
lumbosacral spine, "with stenosis, disc bulging and facet
arthrosis" (Tr. 323).  She stated that plaintiff had worked as a
janitor, but was now unable to do any "heavy lifting or bending"
because of his back problems (Tr. 323).  Upon examination, Dr.
Dore noted that plaintiff weighed 320 pounds and was obese (Tr.
323-24).  Dr. Dore referred plaintiff for blood work "as soon as
he [had] coverage" (Tr. 324).  She also referred plaintiff to an
orthopedist for his lower back problems and recommended "no heavy
lifting or bending or stooping or crouching or crawling or dusty
environments given [plaintiff's] asthma" (Tr. 324).

On November 4, 2009, plaintiff was seen by Dr. Paolo
Ampil at MCHC (Tr. 315).  On an intake form, plaintiff reported
that he was "[f]eeling down, depressed or hopeless" (Tr. 315).
Plaintiff complained of low back pain radiating to his right leg,
with numbness (Tr. 316).  A skeletal examination of plaintiff
revealed lumbosacral tenderness on the his right side (Tr. 316).
Neurologically, a straight leg raise test showed that plaintiff
could achieve 45 degrees on the right leg and 80 degrees on his
left leg (Tr. 316).  Dr. Ampil diagnosed plaintiff with

9

degenerative disc disease with radiculopathy[10] and obesity (Tr. 317).  Dr. Ampil prescribed ibuprofen, Flexeril[11] and Vicodin[12] and also suggested that plaintiff attend physical therapy (Tr. 317).

> 3.   Evidence After Last
>      <u>Insured Date</u>

On May 27, 2010, plaintiff visited MCHC for the purpose of completing paperwork (Tr. 356).  He met with Dr. Ampil, who continued him on his then-current treatment (Tr. 357).  Dr. Ampil also made a note on a prescription pad stating that plaintiff was "totally disabled" due to his degenerative disc disease (Tr. 276).

That same day, Dr. Ampil completed a Medical Report for Determination of Disability worksheet, on which he diagnosed plaintiff with degenerative disc disease and stated that plaintiff had the capacity to perform only sedentary work (Tr.

---

[10] Radiculopathy is "[d]isorder of the spinal nerve roots." <u>Stedman's</u> at 1503.

[11] Plaintiff suggests that he was prescribed Fiorinal (Pl. Mem. at 5), but this statement appears to rest on a misreading of the record.

[12] Vicodin, used to treat pain is a brand name drug containing acetaminophen and hydrocodone.  MedlinePlus - Hydrocodone, http://www.nlm.nih.gov/medlineplus /druginfo/meds/a601006.html(last visited Aug. 12, 2013).

280-01). Sedentary work, according to the form, consisted of lifting 10 pounds occasionally, standing and/or walking for up to two hours daily and sitting for up to six hours daily (Tr. 281). Dr. Ampil noted that plaintiff's non-exertional postural functions were abnormal, limiting his abilities to repetitively stoop, bend, remain seated for extended periods, crouch or squat and climb (Tr. 281). Dr. Ampil also completed a Musculoskeletal Medical Report in which he summarized his previous physical examination findings, including plaintiff's straight leg raise test results (Tr. 282-85). Dr. Ampil indicated that plaintiff was then currently taking ibuprofen (600 mg), Flexeril and Vicodin (Tr. 283).

On May 28, 2010, Dr. T. Harding, a psychologist employed by the New York State Department of Disability Determinations, found that there was insufficient evidence to determine whether plaintiff suffered from any mental impairment. (Tr. 256-71). His report stated, in relevant part: "All treating sources were requested. Few records were sent. Claimant does not appear to have any psychiatric treating sources. Propose -- Denial due to insufficient evidence" (Tr. 270).

On June 3, 2010, plaintiff visited MCHC and again met with Dr. Ampil (Tr. 311-12). The reason for the visit was listed

as "Needs forms filled out" (Tr. 311).  Dr. Ampil again noted that plaintiff was totally disabled and would only be able to perform sedentary work (Tr. 311).  On a Physical Assessment for Determination of Employability worksheet filled out on the same day, Dr. Ampil reiterated that plaintiff would only be able to perform sedentary jobs due to his degenerative disc disease, and that the disability was severe and permanent (Tr. 278).

In a document dated June 15, 2010, issued in connection with a separate application by plaintiff for Medicaid benefits, the Orange County Department of Social Services found that plaintiff met the criteria set forth in Listing 1.04, Disorders of the spine, contained in 20 C.F.R. Part 404, Subpart P, Appendix 1, effective from May 1, 2009 (Tr. 286-89).  The document quoted the entirety of Listing 1.04 was signed by a physician and a social worker (Tr. 288).

On April 22, 2011, plaintiff visited MCHC for a refill of his medication (Tr. 352).  Plaintiff was examined by Dr. Stacey White-Connell, who remarked that there was "no acute grimacing or sudden movements" when palpating plaintiff's back (Tr. 352).  Dr. White-Connell further noted that plaintiff was not using an ambulatory device when he was seen that day (Tr. 352).  Dr. White-Connell diagnosed plaintiff with degenerative

12

disc disease with chronic pain and prescribed an increased dose
of ibuprofen (800 mg) (Tr. 353).

On June 7, 2011, plaintiff visited MCHC for a follow-up
appointment after a diabetes-related emergency room visit the
prior week (Tr. 343-50).  Dr. White-Connell noted that plaintiff
had newly diagnosed diabetes (Tr. 350).

On June 15, 2011, plaintiff returned to MCHC,
complaining of a chest cold (Tr. 345-46).  After an examination,
Dr. White-Connell diagnosed plaintiff with hypertension, diabetes
mellitus, chronic back pain, and an upper respiratory infection
(Tr. 345-46).

    D.   Proceedings
       <u>Before the ALJ</u>

Plaintiff's administrative hearing was conducted on
July 21, 2011 before ALJ Gonzalez (Tr. 32).  Plaintiff testified
to the following facts.

Plaintiff first stated that he had graduated high
school and had attended several college courses (Tr. 35-36).
Plaintiff then testified about his work history, beginning with
his job as a sales representative at Home Depot in 1996 and 1997,
which he stated involved heavy lifting (Tr. 36).  According to
plaintiff, his next job was as a machine operator at a company

called Bull Metal (Tr. 37).  This position did not involve much heavy lifting, but did require him to "be at sort of like a half-bend position" for 12-hour days, which "[took] a toll" on his back and legs (Tr. 37-38).

After the ALJ noted a gap in plaintiff's work records from 2002 through 2004, plaintiff explained that he did various jobs for Social Services as part of a "Welfare-to-Work" program, including working at a Salvation Army and at a laundromat (Tr. 38-39).

In 2005 through 2006, plaintiff stated that he worked for Pep Boys in an automotive warehouse as an "order picker" (Tr. 39).  Plaintiff testified that this job involved "extreme heavy lifting," and that he was regularly required to lift boxes containing motorized scooters weighing up to 140 pounds (Tr. 39). Plaintiff stated that, while working for Pep Boys, he suffered his "first blowout with [his] back," which resulted in his having to take a month-long leave of absence (Tr. 39).

Plaintiff next testified that he weighed 294 pounds, and had recently lost significant weight due to changes in his diet after learning that he had diabetes (Tr. 40-41).  In addition to dietary changes, plaintiff attributed his weight loss

14

to his use of metformin[13] pills, which he was taking to treat his
diabetes (Tr. 41).

Plaintiff also testified that he lived alone and did
not have any children (Tr. 41).

Turning to the medical evidence, the ALJ asked
plaintiff about his May 2009 visit to the hospital, specifically,
why he never made any follow-up appointment with a specialist
(Tr. 41).  Plaintiff responded as follows:

> Well, after the emergency room and they pumped me
> up with a really powerful painkiller and a steroid and
> that and I did go follow-up about, I think, a month --
> it took about a month to make an appointment at
> Middletown medical to see doctor -- with Dr. Appell
> [PHONETIC].[14]  He was the guy I was seeing for a
> while.  And a similar incident happened just about the
> most three months ago.  The only thing I could have, if
> I could have my landlord vouch for that, if you need
> him to write some kind of a --

(Tr. 44-45).  The ALJ responded that he "[didn't] need a voucher"
and that he needed "medical evidence" (Tr. 45).[15]

---

[13] "Metformin is used alone or with other medications,
including insulin, to treat type 2 diabetes (condition in which
the body does not use insulin normally and, therefore, cannot
control the amount of sugar in the blood)."  Metformin - PubMed
Health, http://www.nlm.nih.gov/medlineplus/druginfo/
meds/a696005.html (last visited Aug. 12, 2013).

[14] It is unclear from the record whether plaintiff's
reference to "Dr. Appell" was intended as a reference to Dr.
Ampil or a different doctor.

[15] Although plaintiff does not raise the issue, I note that
20 C.F.R. §§ 404.1512 and § 404.1513 explicitly permit the use of
(continued...)

The ALJ next asked plaintiff about the medical tests that had been conducted on him (Tr. 45), resulting in the following colloquy:

[ALJ:]   Can I ask you a question? Did you ever get an MRI done?  I know the CT was done.

[Pl.:]   Yes.

[ALJ:]   And the CT was not -- did not show any kind of herniation or sometimes [INAUDIBLE] because [it] is not geared for that.  Did they ever send you out for the MRI?

[Pl:]    The CT -- sir, may I say this?  I don't know what -- the CT scan records show that I have spinal stenosis, spinal arthrosis, the degenerated disc in the bulge which was from the MRI that I took -- that I had taken in 2002.  That was a first-time.

[ALJ:]   All right, I'm looking for nerve root impingements and herniations and I didn't see that in there.  So you're right, I agree with your assessment, that's what it said.  But I didn't see herniations, nor did I see nerve root impingements for things that I look for. And usually those come out well in MRIs and I did not see that you had an MRI, just that CT. [Am I] right about that?

[Pl.:]   I had an MRI in early 2000.  It's 2001 or 2002.  I was seeing Dr. Appell at the time. He was an orthopedist.  And when he -- I saw him and he looked at the scans for me, he described that I had a herniated disc -- a degenerated disc and a disc bulge.  And he was showing me how it was affecting -- you

---

[15](...continued)
the type of evidence plaintiff attempted to describe to the ALJ.

16

know, he explained to me why [I] was getting
the pain.

(Tr. 45-46).

Plantiff testified that he was currently taking 800 mg
ibuprofen pills, and his prescription strength had recently been
increased from 600 mg pills by "Dr. Conley [PHONETIC]"[16] (Tr. 46-
47).

ALJ Gonzelez then questioned plaintiff about his daily
activities, and plaintiff stated that he was "home a lot," and
that he did "a lot of sitting and laying down" (Tr. 47).
Plaintiff testified that he could he could sit for 2-3 hours and
stand for 1-2 hours before having to lie down (Tr. 47).  He also
stated that he would occasionally shop for food within "half a
block" from his home and also use his computer (Tr. 47).

Plaintiff stated that he had never been arrested or
used drugs (Tr. 47-48).

ALJ Gonzelez then asked plaintiff why he had not "gone
on to see other doctors or specialists to see, you know, what
exactly is going on with your back" (Tr. 49).  Plaintiff
responded that he had tried therapy, but it had only worsened his

---

[16] It is unclear whether the reference to "Dr. Conley" is
actually a reference to Dr. White-Connell or whether plaintiff is
referring to a different doctor, although  the record indicates
that Dr. White-Connell did, in fact, increase plaintiff's
ibuprofen dose from 600 mg to 800 mg on April 22, 2011 (Tr. 353).

pain (Tr. 49).  Plaintiff also stated that he had been seeing "Dr. Conley" for the previous three months, and that he was taking painkillers when he needed them (Tr. 49).  Plaintiff testified that he had seen an orthopedist in "the early 2000s when [he] got the first MRI" (Tr. 49).  When asked by ALJ Gonzalez whether he had seen a "pain management doctor," plaintiff responded that he had not, and appeared to be unaware that such doctors existed (Tr. 49).

Plaintiff was then asked questions by his own attorney (Tr. 51).  Plaintiff stated that he experienced pain when he was on his feet for more than an hour or two, and would sometimes go shopping at Wal-Mart (Tr. 51).  Plaintiff testified that he felt pain in his "entire right leg, lower back, right side, and all of the whole right leg" (Tr. 51).  He stated that he experienced similar pain when sitting for more than two or three hours (Tr. 51-52).  Plaintiff testified that he could lift "couple of gallons of water" in bags, which he estimated to be approximately eight pounds (Tr. 52).  Plaintiff stated that to alleviate his pain, he needed to lay down between six and nine times each day, for one to two hours at a time (Tr. 52-53).  Finally, plaintiff testified that he sometimes had difficulty sleeping due to his pain, and that he did a lot of reading (Tr. 53-54).

III. <u>Analysis</u>

    A.  Applicable
       <u>Legal Principles</u>

       1.  <u>Standard of Review</u>

      The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard.  42 U.S.C. § 405(g); <u>Burgess v. Astrue</u>, 537 F.3d 117, 127-28 (2d Cir. 2008); <u>Shaw v. Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Tejada v. Apfel</u>, 167 F.3d 770, 773-74 (2d Cir. 1999); <u>Bubnis v. Apfel</u>, 150 F.3d 177, 181 (2d Cir. 1998).

      The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence.  <u>Tejada v. Apfel</u>, <u>supra</u>, 167 F.3d at 773-74; <u>Johnson v. Bowen</u>, 817 F.2d 983, 985 (2d Cir. 1987); <u>Ellington v. Astrue</u>, 641 F. Supp. 2d 322, 327-28 (S.D.N.Y. 2009) (Marrero, D.J.).  "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision."  <u>Ellington v. Astrue</u>, <u>supra</u>, 641 F. Supp. 2d at 328; <u>accord</u> <u>Johnson v. Bowen</u>, <u>supra</u>, 817 F.2d at 986.  However, "where application of the correct

legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration." Johnson v. Bowen, supra, 817 F.2d at 986.

"The Supreme Court has defined substantial evidence as 'more than a mere scintilla' and as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971). "Consequently, where [there is] substantial evidence . . . this Court may not substitute its own judgment as to the facts, even if a different result could have been justifiably reached upon de novo review." Beres v. Chater, No. CV-93-5279 (JG), 1996 WL 1088924 at *5 (E.D.N.Y. May 22, 1996); see also Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984). Thus, "'[t]o determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" Terwilliger v. Comm'r of Soc. Sec., No. 3:06-CV-0149 (FJS/GHL), 2009 WL 2611267 at *2 (N.D.N.Y. Aug. 24, 2009), citing Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).

2.  Determination
    of Disability

Under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., a claimant is entitled to disability benefits if he or she can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see also Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both impairment and inability to work must last twelve months).  The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D), and it must be

> of such severity that [the claimant] is not only unable to do his previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [the claimant] lives, or whether a specific job vacancy exists for [the claimant], or whether [the claimant] would be hired if [the claimant] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner must consider both objective and subjective factors when assessing a disability claim, including: (1) objective medical facts and clinical findings, (2) diagnoses

21

or medical opinions of examining physicians, (3) subjective
evidence of pain or disability to which the claimant and family
or others testify and (4) the claimant's educational background,
age and work experience. Brown v. Apfel, 174 F.3d 59, 62 (2d
Cir. 1999); Rivera v. Schweiker, 717 F.2d 719, 723 (2d Cir.
1983).

"In evaluating disability claims, the [Commissioner] is
required to use a five-step sequence, promulgated in 20 C.F.R.
§§ 404.1520, 416.920." Bush v. Shalala, 94 F.3d 40, 44 (2d Cir.
1996).

> First, the Commissioner considers whether the claimant
> is currently engaged in substantial gainful activity.
> Where . . . the claimant is not so engaged, the
> Commissioner next considers whether the claimant has a
> "severe impairment" that significantly limits his
> physical or mental ability to do basic work activities
> . . . . Where the claimant does suffer a severe
> impairment, the third inquiry is whether, based solely
> on medical evidence, he has an impairment listed in
> Appendix 1 of the regulations or equal to an impairment
> listed there . . . . If a claimant has a listed
> impairment, the Commissioner considers him disabled.
> Where a claimant does not have a listed impairment, the
> fourth inquiry is whether, despite his severe
> impairment, the claimant has the residual functional
> capacity to perform his past work . . . . Finally,
> where the claimant is unable to perform his past work,
> the Commissioner then determines whether there is other
> work which the claimant could perform.

Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); see also
Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); Butts v. Barnhart,
388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds on

rehearing, 416 F.3d 101 (2d Cir. 2005); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Shaw v. Chater, supra, 221 F.3d at 132; Brown v. Apfel, supra, 174 F.3d at 62; Tejada v. Apfel, supra, 167 F.3d at 774; Rivera v. Schweiker, supra, 717 F.2d at 722.

Step four requires that the ALJ make a determination as to the claimant's residual functional capacity.  See Sobolewski v. Apfel, 985 F. Supp. 300, 309 (E.D.N.Y. 1997).  RFC is defined in the applicable regulations as "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  To determine RFC, the ALJ makes a "function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch." Sobolewski v. Apfel, supra, 985 F. Supp. at 309.  The results of this assessment determine the claimant's ability to perform the exertional demands of sustained work, and may be categorized as sedentary, light, medium, heavy or very heavy.  20 C.F.R. §§ 404.1567, 416.967; see Rodriguez v. Apfel, 96 Civ. 8330 (JGK), 1998 WL 150981 at *7 n.7 (S.D.N.Y. Mar. 31, 1998) (Koeltl, D.J.).

The claimant bears the initial burden of proving disability with respect to the first four steps.  Burgess v. Astrue, supra, 537 F.3d at 128; Green-Younger v. Barnhart, supra,

335 F.3d at 106; Balsamo v. Chater, supra, 142 F.3d at 80.  Once

the claimant has satisfied this burden, the burden shifts to the

Commissioner to prove the final step -- that the claimant's RFC

allows the claimant to perform some work other than the

claimant's past work.  Balsamo v. Chater, supra, 142 F.3d at 80;

Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

> In meeting [his] burden of proof on the fifth step
> of the sequential evaluation process described above,
> the Commissioner, under appropriate circumstances, may
> rely on the medical-vocational guidelines contained in
> 20 C.F.R. Part 404, Subpart P, App. 2, commonly
> referred to as "the Grid."  The Grid takes into account
> the claimant's RFC in conjunction with the claimant's
> age, education and work experience.  Based on these
> factors, the Grid indicates whether the claimant can
> engage in any other substantial gainful work which
> exists in the national economy.

Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995) (Koeltl,

D.J.).  When a claimant retains the RFC to perform at least one

of the categories of work listed on the Grid, and when the

claimant's educational background and other characteristics are

also captured by the Grid, the ALJ may rely exclusively on the

Grid in order to determine whether the claimant retains the RFC

to perform some work other than his or her past work.  Butts v.

Barnhart, supra, 388 F.3d at 383 ("In the ordinary case, the

Commissioner meets his burden at the fifth step by resorting to

the applicable medical vocational guidelines (the [Grid]).")

(internal quotation and citation omitted).

However, "exclusive reliance on the [Grid] is inappropriate" where non-exertional limitations "limit the range of sedentary work that the claimant can perform." Butts v. Barnhart, supra, 388 F.3d at 383, quoting Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999) (internal quotation omitted); Bapp v. Bowen, supra, 802 F.2d at 603. When a claimant suffers from a non-exertional limitation such that he is "unable to perform the full range of employment indicated by the [Grid]," Bapp v. Bowen, supra, 802 F.2d at 603, or the Grid fails "to describe the full extent of [the] claimant's physical limitations," the Commissioner must offer the testimony of a vocational expert in order to prove "that jobs exist in the economy which the claimant can obtain and perform." Butts v. Barnhart, supra, 388 F.3d at 383 (internal quotation and citation omitted from first quotation); see 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered.").

3. Treating Physician Rule

When considering the evidence in the record, the ALJ is required to give deference to the opinions of a claimant's

treating physicians.  Under the regulations' "treating physician rule," a treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record."  20 C.F.R. § 404.1527(d)(2); Shaw v. Chater, supra, 221 F.3d at 134; Diaz v. Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must apply various factors to determine the amount of weight the opinion should be given. These factors include:  (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area and (6) other factors that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c)(2)-(6); Schisler v. Sullivan, supra, 3 F.3d at 567; Mitchell v. Astrue, 07 Civ. 285 (JSR), 2009 WL 3096717 at *16 (S.D.N.Y. Sept. 28, 2009) (Rakoff, D.J.) (adopting Report and Recommendation of Freeman, M.J.); Matovic v. Chater, 94 Civ. 2296 (LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan. 12. 1996) (McKenna, D.J.).  "[G]ood

26

reasons" must be given for declining to afford a treating

physician's opinion controlling weight.  20 C.F.R.

§ 404.1527(d)(2); Schisler v. Sullivan, supra, 3 F.3d at 568;

Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *6 n.3

(S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).

        4.   Development
            of the Record

"It is the rule in the [Second] [C]ircuit that 'the

ALJ, unlike a judge in a trial, must [him]self affirmatively

develop the record' in light of 'the essentially non-adversarial

nature of a benefits proceeding.'" Pratts v. Chater, 94 F.3d 34,

37 (2d Cir. 1996), quoting Echevarria v. Sec'y of Health & Human

Servs., 685 F.2d 751, 755 (2d Cir. 1982).

> Because a hearing on disability benefits is a non-
> adversarial proceeding, the ALJ generally has an
> affirmative obligation to develop the administrative
> record.  Echevarria v. Secretary of Health & Human
> Servs., 685 F.2d 751, 755 (2d Cir. 1982).  This duty
> exists even when the claimant is represented by counsel
> . . . . The [Commissioner's] regulations describe this
> duty by stating that, "[b]efore we make a determination
> that you are not disabled, we will develop your
> complete medical history . . . [and] will make every
> reasonable effort to help you get medical reports from
> your own medical sources when you give us permission to
> request the reports." 20 C.F.R. § 404.1512(d).

Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); see Halloran v.

Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) ("We have stated many

times that the ALJ generally has an affirmative obligation to develop the administrative record . . . . ") (internal quotations and citation omitted); Shaw v. Chater, supra, 221 F.3d at 131 ("The ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel."); Tejada v. Apfel, supra, 167 F.3d at 774 (same); Van Dien v. Barnhart, 04 Civ. 7259 (PKC), 2006 WL 785281 at *14 (S.D.N.Y. Mar. 24, 2006) (Castel, D.J.) (same); Molina v. Barnhart, 04 Civ. 3201 (GEL), 2005 WL 2035959 at *6 (S.D.N.Y. Aug. 17, 2005) (Lynch, D.J.) (same).

The regulations also state that "[w]hen the evidence we receive from your treating physician . . . or other medical source is inadequate for us to determine whether you are disabled, . . . [w]e will first recontact your treating physician . . . or other medical source to determine whether the additional information we need is readily available."  20 C.F.R. § 404.1512(e); see also Perez v. Chater, supra, 77 F.3d at 47.

Where the ALJ has failed to develop the record adequately, remand to the Commissioner for further development is appropriate.  See Pratts v. Chater, supra, 94 F.3d at 39.

B.   The ALJ's
     <u>Decision</u>

ALJ Gonzalez first noted that plaintiff met the
disability insured status requirements through March 31, 2010
(Tr. 22).  The ALJ then applied the five-step analysis described
above, relying on the medical evidence and plaintiff's testimony
to determine that plaintiff was not disabled (Tr. 22-27).

At step one, the ALJ found that plaintiff had not
engaged in substantial gainful activity from his alleged onset
date of May 1, 2008 through his last insured date of March 31,
2010 (Tr. 22).

At step two, the ALJ found that plaintiff suffered from
the severe impairments of lumbar degenerative disc disease and
obesity (Tr. 22).  With respect to plaintiff's asthma and
depression, the ALJ found these alleged impairments to be non-
severe (Tr. 22-23).  With respect to plaintiff's asthma, ALJ
Gonzalez stated that plaintiff had not alleged asthma as a
disabling impairment in his initial DIB application (Tr. 22).
The ALJ further stated:

> While the treating physician's notes state that the
> claimant "has mild asthma <u>when</u> he has bronchitis," (see
> Exhibit 12F, at 19 (11F, at 17), there are no
> diagnostic tests (e.g., spirometry/pulmonary function
> tests) to confirm her diagnosis.  Likewise, there is no
> evidence of medical treatment for acute, chronic or

>recurrent asthma attacks, and the claimant is not
>taking any medication for asthma.

(Tr. 22-23).

Concerning plaintiff's depression, ALJ Gonzalez claimed
to find essentially no record evidence for the condition, save
for a vague mention in a June 2011 report that plaintiff was
"sometimes" depressed (Tr. 23).

The ALJ also addressed plaintiff's diabetes, and stated
that there was no evidence that plaintiff was symptomatic prior
to May 2011, long after plaintiff's last insured date (Tr. 23).
Thus, the ALJ concluded "for purposes of [the] decision, the
impairment [was] non-severe" (Tr. 23).

At step three, the ALJ found that none of plaintiff's
impairments, either singly or in combination, were severe enough
to meet or medically equal the impairments listed in 20 C.F.R.
Part 404, Subpart P, Appendix 1 (Tr. 16, citing 20 C.F.R. §§
404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926)
(Tr. 23).

At step four, the ALJ found that "through the date last
insured, [plaintiff] had the residual functional capacity to
perform light work as defined in 20 CFR 404.1567(b) except for
work requiring more than occasional crouching and stooping" (Tr.
23). After summarizing plaintiff's medical evidence, ALJ

30

Gonzalez turned to plaintiff's credibility, stating that
"[plaintiff's] medically determinable impairments could
reasonably be expected to cause the alleged symptoms; however,
[plaintiff's] statements concerning the intensity, persistence
and limiting effects of these symptoms are not credible to the
extent they are inconsistent with the above residual functional
capacity assessment" (Tr. 24).

The ALJ then offered a further summary of plaintiff's
medical records.  He stated that a "CAT scan of the lumbar spine
showed lumbar [degenerative disc disease] at L4-L5, L5-S1 with
some disc bulging and stenosis, but no focal disc herniation,
thecal sac impingement or nerve root compression" (Tr. 24).  The
ALJ remarked that treatment records from MCHC showed that
plaintiff received "conservative" treatment for his spinal
condition (Tr. 24).

The ALJ then returned to his assessment of the
credibility of plaintiff's subjective complaints, and suggested
that plaintiff's "spotty work history" demonstrated "poor
motivation to work and lessen[ed] his credibility" (Tr. 24).  The
ALJ found Dr. Ampil's statement that plaintiff's pain was due to
heavy lifting and being overweight unpersuasive, because
plaintiff had been obese "most of his life" and "managed to work
for approximately 18 consecutive years, doing physically

31

demanding jobs" (Tr. 24-25).  The ALJ stated that there was
"little in the form of objective evidence to support a finding of
total disability," and further suggested that "the medical
evidence [was] intermittent, with little in the way of consistent
treatment" (Tr. 25).  According to the ALJ, plaintiff's
credibility was further lessened by his failure to explain at the
hearing why he did not "seek pain management and ha[d] only
undergone the most conservative of treatments," as well as his
failure "to explain why he did not see an orthopedist or
orthopedic surgeon to evaluate his complaints of low back pain"
(Tr. 25).  The gap in treatment from June 2010 through April 2011
was also cited by the ALJ as evidence of plaintiff's lack of
credibility (Tr. 25).

        ALJ next turned to medical opinion evidence, and, in
rapid succession, dispensed with the opinions of three doctors
(Tr. 25).  First, with respect to Dr. Dore the ALJ wrote:

> [Dr. Dore] opined that [plaintiff] could not do heavy
> lifting, bending, stooping, crouching or working in
> dusty environments (Exhibit 12F, at 20).  In the same
> note, Dr. Dore further noted that [plaintiff's] pain
> had improved within a few months with medication only.
> Dr. Dore further noted that [plaintiff] had "mild
> asthma when he has bronchitis," but there are no
> documented asthma attacks in the clinical record.
> Thus, Dr. Dore's opinion is not fully persuasive.

(Tr. 25).  Regarding the opinion of the doctor and social worker
at Orange County Department of Social Services that plaintiff's

spinal impairment satisfied Listing 1.04, the ALJ stated that

"they did not discuss any specific clinical findings, nor did

they provide an explanation of the medical evidence they relied

on" in making the determination (Tr. 25).   Accordingly, the ALJ

found that the "nonspecific assessment [could] not be given any

weight" (Tr. 25).   Finally, with respect to Dr. Ampil's opinions

on May 27 and June 10, 2010[17] that plaintiff was "totally

disabled" and was restricted to sedentary work, the ALJ found

that they were "not well supported by clinical or laboratory

findings; in fact, other than providing minimal objective

findings, Dr. Ampil attributed [plaintiff's] pain to "a lot of

heavy lifting" and "to being overweight" (Tr. 25).   Thus, the ALJ

accorded Dr. Ampil's opinions "little weight" (Tr. 25).

      The ALJ summarized his determination that plaintiff had

the residual functional capacity to perform "a broad range of

light work" as follows:

> [T]he above residual functional capacity assessment is
> supported by minimal objective findings, essentially
> conservative treatment with good relief with medication
> within five months of treatment, and [plaintiff's]
> failure to seek additional treatment in an effort to
> relieve his pain.   This belies his allegations of
> chronic, debilitating, disabling pain.

---

[17] Although the ALJ refers to Dr. Ampil's June 10, 2010
assessment, he appears to be referring to the assessment of June
3, 2010 (see Tr. 278-79).

(Tr. 25).

At the conclusion of step four, based on plaintiff's RFC, the ALJ found that he was incapable of performing any of his past jobs, which involved tasks more strenuous than light work (Tr. 25, citing 20 C.F.R. § 404.1565).

At step five, the ALJ determined that, based on plaintiff's age, which was then 43 years old, he was a "younger individual" as of his date last insured (Tr. 26, citing 20 C.F.R. § 404.1563).  The ALJ also stated that plaintiff had a high school education and was able to communicate in English (Tr. 26). Therefore, the ALJ found that transferability of job skills was not a factor in determining whether plaintiff was disabled (Tr. 26, citing S.S.R. 82-41; 20 C.F.R. Part 404, Subpart P, Appendix 2).  The ALJ stated:

> Through the date last insured, if [plaintiff] had the
> residual functional capacity to perform the full range
> of light work, considering [plaintiff's] age,
> education, and work experience, a finding of 'not
> disabled would be directed by Medical Vocational Rule
> 202.21.  However, the additional limitations had little
> or no effect on the occupational base of unskilled
> light work, since stooping is required only
> occasionally and crouching is not required at all in
> light jobs (SSRs 84-14 and 85-15).

(Tr. 26).  Accordingly, the ALJ concluded that plaintiff did not suffer from any disability during the alleged period (Tr. 26).

34

C.   Analysis of the
     <u>ALJ's Decision</u>

1.   <u>Legal Error</u>

As noted above, the first inquiry in a district court's review of a decision by the Commissioner is whether the Commissioner applied the correct legal principles in reaching his or her determination.  <u>Tejada v. Apfel</u>, <u>supra</u>, 167 F.3d at 773; <u>Johnson v. Bowen,</u> <u>supra</u>, 817 F.2d at 985; <u>Ellington v. Astrue</u>, <u>supra</u>, 641 F. Supp. 2d at 327-28; <u>Santiago v. Barnhart</u>, 441 F. Supp. 2d 620, 625 (S.D.N.Y. 2006).

Plaintiff's memorandum of law in support of his motion for judgment on the pleadings, which was prepared by counsel, is poorly drafted and disorganized,[18] often making it difficult to

---

[18] In a another recent case also involving the same attorney that represents plaintiff here, the Honorable Katherine B. Forrest, United States District Judge, referred to a memorandum submitted by plaintiff's counsel as "cryptic, at best," and further stated:

> The memorandum submitted by counsel for plaintiff is rife with misspellings, incomplete sentences and arguments lacking grammatical or legal sense.  The submissions were difficult to understand, to say the least.  The Court cautions plaintiff's counsel that his duty to his client requires greater diligence.

<u>Savoie v. Astrue</u>, 11 Civ. 1858 (KBF), 2013 WL 1285159 *3 n.2 (S.D.N.Y. Mar. 29, 2013).

(continued...)

understand plaintiff's various arguments, many of which are raised in a conclusory and summary fashion.  After a thorough review of plaintiff's legal memorandum, I construe it to state the following arguments that ALJ Gonzalez committed legal error: (1) the ALJ improperly injected his own lay opinion as to the validity of certain diagnostic tests and failed to subpoena medical records that would have supported plaintiff's disability claim (Pl. Mem. at 10); (2) the ALJ violated the treating physician rule with respect to Drs. Dore and Ampil (Pl. Mem. at 13-15); (3) the ALJ improperly evaluated plaintiff's credibility (Pl. Mem. at 17-19); and (4) the ALJ failed to perform a function by function analysis of plaintiff's RFC and did not "explain specifically . . . what work functions were precluded by the combined effect of [plaintiff's] obesity on his nonexertional and exertional impairments" (Pl. Mem. at 12-13).  The remainder of plaintiff's arguments are either arguments that the Commissioner's determination was not supported by substantial

---

[18](...continued)
     Judge Forrest's admonition applies here with equal force. In one egregious instance of sloppy drafting, plaintiff's counsel has even failed to substitute the name of an old client for Mr. Agapito.  See Pl. Mem. at 16 ("Arguably, Mr. McKevitt at least equaled Listing 1.04, through application of 20 CFR 404.1526."); McKevitt v. Astrue, 11-CV-970, 2012 WL 4480621 (N.D.N.Y. Sept. 26, 2012) (case involving plaintiff's counsel).

evidence in various respects, or are so unintelligible as to make meaningful review impossible.

> a.   MRI-Related
> Arguments

Several of plaintiff's arguments arise out of the following colloquy between plaintiff and the ALJ, also quoted above:

> [ALJ:]   Can I ask you a question? Did you ever get an MRI done?  I know the CT was done.
>
> [Pl.:]   Yes.
>
> [ALJ:]   And the CT was not -- did not show any kind of herniation or sometimes [INAUDIBLE] because [it] is not geared for that.  Did they ever send you out for the MRI?
>
> [Pl:]   The CT -- sir, may I say this?  I don't know what -- the CT scan records show that I have spinal stenosis, spinal arthrosis, the degenerated disc in the bulge which was from the MRI that I took -- that I had taken in 2002.  That was a first-time.
>
> [ALJ:]   All right, I'm looking for nerve root impingements and herniations and I didn't see that in there.  So you're right, I agree with your assessment, that's what it said.  But I didn't see herniations, nor did I see nerve root impingements for things that I look for. And usually those come out well in MRIs and I did not see that you had an MRI, just that CT. [Am I] right about that?
>
> [Pl.:]   I had an MRI in early 2000.  It's 2001 or 2002.  I was seeing Dr. Appell at the time. He was an orthopedist.  And when he -- I saw

> him and he looked at the scans for me, he
> described that I had a herniated disc -- a
> degenerated disc and a disc bulge.  And he
> was showing me how it was affecting -- you
> know, he explained to me why [I] was getting
> the pain.

(Tr. 45-46).

Citing to the foregoing exchange, plaintiff first argues:

> The ALJ was not prepared to recognize a sign of pain
> other than findings shown by MRI.  He said that he was
> looking for herniations, and nerve root impingement's
> [sic], and that they usually those came out well in
> MRIs, but didn't see that in a CT scan.  The ALJ, a
> layman, had no basis in the evidence to conclude
> whether herniations and nerve root impingements came
> out better on an MRI than a CT scan.

(Pl. Mem. at 10).  This argument is not persuasive.

While it is true the ALJ, a lay person, had no basis to conclude that a CT scan was "not geared for" showing nerve root impingements and herniations, the fact remains that Dr. Racenelli concluded that plaintiff's May 2009 CT scan did not show nerve root impingements or herniations (Tr. 210).  As defendants correctly note, the ALJ's statement, while inartfully worded, was only meant to convey "that additional objective diagnostic testing, if available, might [have] confirm[ed] the presence of a neurological disorder, which plaintiff's CT scan did not reveal" (Def. Mem. at 19).  Plaintiff's suggestion that the colloquy demonstrates that the ALJ "was not prepared to recognize a sign

38

of pain other than findings shown by MRI" is baseless and
contradicted by the ALJ's opinion, which references the May 2009
CT scan.

Based on the above-quoted colloquy, plaintiff also
argues that "[t]he ALJ was made aware of an MRI in 2000 said to
be in Dr. Appel's possession.  He could have, but didn't subpoena
it.  It was material because the ALJ thought so.  The failure
denied due process" (Pl. Mem. at 10).  This argument is also not
compelling.  Although an ALJ has an affirmative duty to develop
the record, "the decision to issue a subpoena [is] within the
sound discretion of the ALJ" Yancey v. Apfel, 145 F.3d 106, 111
(2d Cir. 1998), and the issuance of such a subpoena is
appropriate only when "reasonably necessary for the full
presentation of a case" 20 C.F.R. § 404.950(d)(1).  Plaintiff
makes no showing that the 2000 MRI was "reasonably necessary" to
the determination of his case; indeed, given the temporal
remoteness of the MRI to his alleged disability period --
approximately eight years -- such a showing would be extremely
difficult to make.  Thus, in the absence of any evidence that the
2000 MRI would have been material to plaintiff's disability
determination, I conclude that the ALJ's decision not to obtain
it was within his discretion and was not a denial of due process.

b.   Treating
     Physician Rule

i.   Dr. Dore

Plaintiff next argues that ALJ Gonzalez's treatment of
Dr. Dore's medical opinion violated the treating physician rule.

As explained above, "[a]n ALJ is required to give
controlling weight to the medical opinion of a claimant's
treating physician when that opinion:  (1) concerns the nature
and severity of an impairment; (2) is well-supported by medically
acceptable clinical and laboratory diagnostic techniques; and (3)
is not inconsistent with other substantial evidence in the case
record."  Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010)
(summary order).  Here, there is no dispute that Dr. Dore was one
of plaintiff's treating physicians; indeed, the ALJ expressly
refers to her as a "treating physician" (Tr. 25) and defendant
does not appear to take issue with this designation.  Thus, the
only issue is whether the ALJ accorded Dr. Dore's opinions their
proper weight.

On August 12, 2009, Dr. Dore, noted that plaintiff
"ha[d] environmental allergies and mild asthma when he ha[d]
bronchitis" (Tr. 323).  She further noted that the May 2009 CT
scan showed a "diffuse degenerative disease" in the area of

plaintiff's lumbosacral spine (Tr. 323).  Dr. Dore recommended

"no heavy lifting or bending or stooping or crouching or crawling

or dusty environments given [plaintiff's] asthma" (Tr. 324).  Her

report makes clear that she based this determination on

plaintiff's self-reported symptoms, his medical history -- which

included his May 2009 CT scan -- and her own physical evaluation

of plaintiff (Tr. 323-24).  In deciding not to give Dr. Dore's

opinions controlling weight, ALJ Gonzalez offered only the

following:

> [Dr. Dore] opined that [plaintiff] could not do heavy
> lifting, bending, stooping, crouching or working in
> dusty environments (Exhibit 12F, at 20).  In the same
> note, Dr. Dore further noted that [plaintiff's] pain
> had improved within a few months with medication only.
> Dr. Dore further noted that [plaintiff] had "mild
> asthma when he has bronchitis," but there are no
> documented asthma attacks in the clinical record.
> Thus, Dr. Dore's opinion is not fully pursuasive.

(Tr. 25).

The ALJ's treatment of Dr. Dore's medical opinions runs

afoul of the treating physician rule in several respects.  First,

the ALJ does not specify the weight given to Dr. Dore's opinions

or differentiate between them, offering only the blanket

statement that they are "not fully persuasive."  It is, thus,

impossible to conduct a meaningful review, because I am left to

speculate as to whether the ALJ simply elected not to give Dr.

Dore's opinions controlling weight, elected to give her opinions

41

no weight at all, or elected to give them some intermediate level
of weight.  Cf. Pierre v. Astrue, No. 09-CV-1864 (JG), 2010 WL
92921 at *9 (E.D.N.Y. Jan. 6, 2010) (noting that the ALJ "failed
. . . to mention the weight [that the treating physicians']
opinions were given (except to say it was not 'great').");
Rodriguez v. Astrue, 07 Civ. 534 (WHP)(MHD), 2009 WL 637154 at
*27 (S.D.N.Y. Mar. 9, 2009) (Pauley, D.J. adopting the Report and
Recommendation of Dolinger, M.J.) (noting that the ALJ failed to
specify the weight given to the treating physicians' findings,
except to say that they had not been given controlling weight);
see also SSR 96-2p, 1996 WL 374188 at *1, *4 ("Treating source
medical opinions are still entitled to deference . . . .
[and][i]n many cases, [the opinion] will be entitled to the
greatest weight and should be adopted, even if it does not meet
the test for controlling weight."); Ellington v. Astrue, supra,
641 F. Supp. 2d at 330 ("The regulations are clear that a
treating physician's opinion should not be completely rejected if
that opinion is found to be non-controlling.").

          ALJ Gonzalez's determination that Dr. Dore's medical
opinions were "not fully persuasive" is also deficient because it
does not provide "good reasons" for the failure to give Dr.
Dore's report controlling weight.  See Halloran v. Barnhart, 362
F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when

the Commissioner has not provided 'good reasons' for the weight given to a treating physicians opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). In dismissing Dr. Dore's opinions, the ALJ simply notes two perceived internal consistencies in Dr. Dore's report. First, the ALJ remarks that plaintiff's pain had "improved . . . with medication only," as if that fact alone somehow undermines Dr. Dore's proposed restrictions. Second, the ALJ appears to suggest that the lack of documented asthma attacks in the record somehow impugns Dr. Dore's diagnosis of asthma, despite the fact that a "treating physician's medical opinion need not be supported by objective clinical or laboratory findings." Cruz v. Sullivan, 912 F.2d 8, 12 (2d Cir. 1990); see also Kraemer v. Apfel, 97 Civ. 8639 (AGS), 1999 WL 66524 at *1 (S.D.N.Y. Feb. 10, 1999) (Schwartz, D.J.). ALJ Gonzelez did not cite any inconsistencies between Dr. Dore's opinions and other medical opinions or substantial evidence in the record, nor does he address any of the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6). The fact that Dr. Dore's report does not appear to be contradicted by any other medical opinions in the record makes ALJ Gonzalez's dismissal of the report even more troubling; in essence, ALJ Gonzalez appears to have rejected

43

Dr. Dore's opinion in the summary fashion that the treating physician rule is designed to prevent, and "arbitrarily substitute[d] his own judgment for competent medical opinion." Mendolia v. Astrue, 10-CV-0417 (ENV), 2013 WL 3356960 at *6 (E.D.N.Y. July 3, 2013), quoting Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999); see also Meadors v. Astrue, supra, 370 F. App'x at 183 ("[T]he ALJ plainly did not choose between properly submitted medical opinions, but rather improperly set his own expertise against that of physicians who submitted opinions to him.").  If ALJ Gonzalez believed that Dr. Dore's report was lacking in support, he should have sought clarification from Dr. Dore in the absence of contrary evidence in the record.  Calzada v. Astrue, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (Sullivan, D.J.) (adopting Report and Recommendation of Dolinger, M.J.) ("[I]f a physician's finding in a report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician to fill any clear gaps before dismissing the doctor's opinion.").

Accordingly, for the reasons set forth above, I conclude that ALJ Gonzalez committed legal error when he failed to explain his basis for not affording controlling weight to Dr. Dore's medical opinions in accordance with the requirements of 20

C.F.R. § 404.1527(c)(2)-(6). On remand, the ALJ should explicitly address the weight given to Dr. Dore's medical opinions, and, if less than controlling weight is afforded, specifically address the requisite factors.

### ii. Dr. Ampil

Plaintiff also argues that the ALJ violated the treating physician rule with respect to Dr. Ampil.

On November 4, 2009, Dr. Ampil diagnosed plaintiff with degenerative disc disease with radiculopathy and obesity (Tr. 317). On May 27, 2010, Dr. Ampil again diagnosed plaintiff with degenerative disc disease and stated that plaintiff had the capacity to perform only sedentary work, i.e., lifting 10 pounds occasionally, standing and/or walking for up to two hours daily and sitting for up to six hours daily (Tr. 280-01). On that same date, Dr. Ampil noted non-exertional postural limitations with respect to plaintiff's capacity to repetitively stoop, bend, remain seated for extended periods, crouch or squat and climb (Tr. 281). On June 3, 2010, Dr. Ampil again noted that plaintiff was totally disabled and would only be able to perform sedentary work (Tr. 311).

ALJ Gonzalez stated that "Dr. Ampil assessed limitations consistent with sedentary work, and opined that

[plaintiff] was 'totally disabled'" (Tr. 25).  In deciding to give

Dr. Ampil's opinions "little weight," ALJ Gonzalez wrote only the

following sentence:  "Dr. Ampil's opinion is not well supported

by clinical or laboratory findings; in fact, other than providing

minimal objective findings, Dr. Ampil attributed plaintiff's pain

to 'a lot of heavy lifting' and 'to being overweight'" (Tr. 25).

ALJ Gonzelez's perfunctory dismissal of Dr. Ampil's

medical opinions is both legally inadequate and factually

misleading, and, like his treatment of Dr. Dore's opinion,

violates the treating physician rule.  First, as noted above,

"good reasons" are required to override the medical opinion of a

treating physician, and an ALJ must "comprehensively set forth

reasons" when he determines to give such an opinion less than

controlling weight.  Halloran v. Barnhart, supra, 362 F.3d at 33.

Here, the ALJ's cursory, one-sentence dismissal of Dr. Ampil's

opinion simply does not satisfy this standard.  As was the case

with Dr. Dore, the ALJ makes no reference to the opinions of

other doctors, nor does he address any of the factors identified

in 20 C.F.R. § 404.1527(c)(2)-(6).  Indeed, had the ALJ done so,

he might have found that Dr. Ampil's opinion was consistent with

that of Dr. Dore, who also noted similar non-exertional

limitations.  Dr. Ampil's findings are also consistent with those

of Dr. Racenelli, who read plaintiff's May 2009 CT scan (Tr.

46

210), Dr. White-Connell and the unnamed doctor at Orange County Department of Social Services, who found that plaintiff satisfied the criteria set forth in Listing 1.04 (Tr. 286-89).

Additionally, the ALJ's brief assessment of Dr. Ampil's reports is also inaccurate.  It is clear from the record that, in addition to plaintiff's subjective complaints, Dr. Ampil based his medical diagnoses and assessments of plaintiff's functional capacity on plaintiff's May 2009 CT scan, which showed degenerative disc disease, and his own physical examination of plaintiff, which included a positive straight leg test (Tr. 282-85).  The ALJ, a lay person, had no basis to dismiss summarily such medical evidence as "minimal objective findings," especially in the absence of contrary evidence in the record (Tr. 25).  In any event, even if the only basis for Dr. Ampil's opinion were plaintiff's subjective complaints, that, by itself, would not justify the dismissal of his opinion in this manner, because a "treating physician's medical opinion need not be supported by objective clinical or laboratory findings." Cruz v. Sullivan, supra, 912 F.2d at 12.  In the absence of contrary evidence in the record, the ALJ was not simply at liberty to "arbitrarily substitute his own judgment for competent medical opinion." Mendolia v. Astrue, supra, 2013 WL 3356960 at *6.  Unfortunately, this is exactly what the ALJ appears to have done.

Accordingly, for the reasons set forth above, I conclude that ALJ Gonzalez committed legal error when he failed to explain his basis for not affording controlling weight to all of Dr. Ampil's medical opinions.  On remand, the ALJ should explicitly address the weight given to Dr. Ampil's medical opinions, and, if less than controlling weight is afforded, specifically address the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6).

c.   Plaintiff's
Credibility

Plaintiff also asserts that ALJ Gonzalez improperly assessed the credibility of his complaints of pain (Pl. Mem. at 17-19).

Evidence of pain is an important element in the adjudication of DIB and SSI claims, and must be thoroughly considered in calculating the RFC of a claimant.  See Lewis v. Apfel, 62 F. Supp. 2d 648, 657 (N.D.N.Y. 1999). "[S]ymptoms, including pain, will be determined to diminish [a claimant's] capacity for basic work activities to the extent that . . . [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. § 404.1529(c)(4).  To that end, the Commissioner has established a two-step inquiry to evaluate a claimant's contentions of pain.  See Social Security Ruling 96-P, 1996 WL 374186 (S.S.A.); 20 C.F.R. § 404.1529(c).  First, the ALJ must determine whether the claimant suffers from a "medically determinable impairment[ ] that could reasonably be expected to produce" the pain alleged.  20 C.F.R. § 404.1529(c)(1); see SSR 96-P.  Second, the ALJ must evaluate the

> intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's pain contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry. See 20 C.F.R. § 404.1529(c)(3)(i)-(vii); Taylor v. Barnhart, 83 Fed.Appx. 347, 350-51 (2d Cir. 2003) (summary order).

Meadors v. Astrue, supra, 370 F. App'x at 183-84.

It is "within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology." Gernavage v. Shalala, 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995) (Leisure, D.J.), accord Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984); Richardson v. Astrue, 09 Civ. 1841 (SAS), 2009 WL 4793994 at *6 n.97 (S.D.N.Y. Dec. 14, 2009) (Scheindlin, D.J.); see Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984); Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.").

Here, the ALJ's assessment of plaintiff's credibility is fundamentally defective. After discussing plaintiff's medical history, the ALJ began his discussion of plaintiff's credibility in the following passage:

> After careful consideration of the evidence, the
> undersigned finds that the claimant's medically
> determinable impairments could reasonably be expected
> to cause the alleged symptoms; however, the claimant's
> statements concerning the intensity, persistence and
> limiting effects of these symptoms are not credible to
> the extent they are inconsistent with the above
> residual functional capacity assessment.

(Tr. 24).  This language extremely troubling, because it suggests

that the ALJ "made a determination with respect to plaintiff's

overall RFC and then used that RFC to discount plaintiff's

non-conforming allegations and resulting limitations."  Norman v.

Astrue, 10 Civ. 5839 (ALC) (HBP), 2012 WL 4378042 at *46

(S.D.N.Y. Sept. 25, 2012) (Carter, D.J.) (adopting Report and

Recommendation of Pitman, M.J.).  As the Honorable Andrew J.

Peck, United States Magistrate Judge, has explained:

> In order to take proper account of the claimant's
> symptoms, the ALJ should first determine the extent to
> which the claimant's symptoms are credible in light of
> the objective record evidence, and then use that
> finding as one aspect of the RFC analysis.  Determining
> the RFC first and then measuring the claimant's
> credibility by that yardstick reverses the standard in
> a way that is not only illogical, but also prejudicial
> to the claimant.

Cruz v. Colvin, 12 Civ. 7346 (PAC)(AJP), 2013 WL 3333040 at *16

(S.D.N.Y. July 2, 2013) (Peck, M.J.) (Report &

Recommendation)(citing cases); see also Seabrook v. Astrue, 11

Civ. 5642 (GBD)(KNF), 2013 WL 1340134 at *3 (S.D.N.Y. Mar. 26,

2013) (Daniels, D.J.)(adopting Report and Recommendation of Fox,

M.J.); Robles v. Astrue, 11 Civ. 5644 (GBD)(HBP), 2013 WL 1180417
at *2 (S.D.N.Y. Mar. 19, 2013) (Daniels, D.J.) (adopting Report
and Recommendation of Pitman, M.J.); Norman v. Astrue, supra,
2012 WL 4378042 at *46, citing Meadors v. Astrue, supra, 370 F.
App'x at 184; Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir.
2007)("Before determining a claimant's RFC, the ALJ first must
evaluate the claimant's credibility.").

        Accordingly, because the ALJ committed legal error when
he determined plaintiff's RFC prior to making a credibility
determination, remand is appropriate on this basis.  On remand,
the ALJ should evaluate plaintiff's credibility before assessing
his residual functional capacity.

                d.   RFC-Related
                     Arguments

        Plaintiff raises several additional arguments that ALJ
Gonzalez erred in determining his RFC, by (1) failing to engage
in a function by function assessment in accordance with SSR 96-8p
(Pl. Mem. at 9) and (2) failing "to explain specifically . . .
what work functions were precluded by the combined effect of
[plaintiff's] obesity on his nonexertional and exertional
impairments" (Pl. Mem. at 12).  Because I have already concluded
that ALJ Gonzalez (1) did not properly apply the treating

physician rule and (2) improperly assessed plaintiff's
credibility, which is integral in determining RFC, I am unable to
give the rest of the ALJ's RFC analysis meaningful review.  See,
e.g., Meadors v. Astrue, supra, 370 F. App'x at 183 ("Because we
agree that the ALJ did not properly evaluate the Appellant's
testimony regarding her pain, we are unable to give his
calculation of Appellant's RFC meaningful review.").  I note,
however, that ALJ Gonzelez's summary of the bases for his
conclusion that plaintiff had the RFC to perform light work makes
no reference to any medical opinions, and is instead based on (1)
"minimal objective findings," (2) "conservative treatment" and
(3) plaintiff's "failure to seek additional treatment" (Tr. 25).
This sort of analysis is highly suspect, and, on remand, the ALJ
is should clarify what specific record evidence and medical
opinions support his RFC determination.  See Zorilla v. Chater,
915 F. Supp. 662, 669 (S.D.N.Y. 1996) (Koeltl, D.J.), quoting
Martin v. Shalala, No. 91-CV-0730E, 1994 WL 263818 at *4
(W.D.N.Y. June 13, 1994).

### 2.   Substantial Evidence

Because I find legal error requiring remand, I do not
reach the issue of whether the ALJ's decision was supported by
substantial evidence.  See Johnson v. Bowen, supra, 817 F.2d at

986 ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have [his] disability determination made according to the correct legal principles."); Ellington v. Astrue, supra, 641 F. Supp. 2d at 328.

IV.   Conclusion

       For all the foregoing reasons, I respectfully recommend that the Commissioner's motion for judgment on the pleadings (Docket Item 17) be denied, that plaintiff's motion for judgment on the pleadings (Docket Item 11) be granted and the case be remanded for further proceedings consistent with this report and recommendation.[19]

---

       [19] Although plaintiff requests that on remand, the matter be reassigned to a different ALJ, "[c]ourts in this circuit usually refrain from deciding whether a claimant's application for benefits should be assigned to a different ALJ upon remand." McClaney v. Astrue, 10-CV-5421 (JG)(JO), 2012 WL 3777413 at *20 (E.D.N.Y. Aug. 10, 2012) (citing cases).  In any event, I respectfully recommend that reassignment to a different ALJ is unnecessary, because plaintiff seeks reassignment solely due to the "ALJ's suppositions about MRI superiority in showing spinal pathology and impairments therefrom" (Pl. Mem. at 21).  For the reasons discussed above, this suggestion is baseless (see pages 37-39, above), and falls well short of meeting any of the factors identified in Robin v. United States of America, 553 F.2d 8, 10
                                                    (continued...)

V.   <u>OBJECTIONS</u>

  Pursuant to 28 U.S.C. § 636(b)(1)(c)) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections.  <u>See also</u> Fed. R. Civ. P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Paul A. Crotty, United States District Judge, 500 Pearl Street, Room 735, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Crotty.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW. <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>United States v. Male Juvenile</u>, 121 F.3d 34, 38 (2d Cir. 1997); <u>IUE AFL-CIO</u>

---

  [19](...continued)
(2d Cir. 1977) that would warrant reassignment on remand.

Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank
v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair
Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714
F.2d 234, 237-238 (2d Cir. 1983).

Dated:   New York, New York
         August 12, 2013

                              Respectfully submitted,


                              _____
                              HENRY PITMAN
                              United States Magistrate Judge


Copies transmitted to:

Irwin M. Portnoy, Esq.
Irwin M. Portnoy & Associates, P.C.
542 Union Avenue
New Windsor, New York  12553

John E. Gura, Jr., Esq.
Assistant United States Attorney
Southern District of New York
86 Chambers Street
New York, New York  10007